**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| JONATHAN DIXON, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>Defendant | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Jonathan Dixon ("Plaintiff"), individually and on behalf of the other members of the below-defined class, which he respectively seeks to represent (the "Class"), hereby alleges against Defendant General Motors LLC ("GM" or "Defendant"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I. INTRODUCTION

1. GM markets itself as a developer and seller of safe and reliable automobiles sold under the Chevrolet, GMC, Buick, and Cadillac brands.

2. As a result, consumers reasonably expect, based on GM's long-term advertising and branding, that GM's vehicles will operate without major mechanical failure during their expected useful lives.

3. This consumer class action concerns model years 2023–2026 Chevrolet Colorado and GMC Canyon equipped with the L3B 2.7L turbocharged four-cylinder engine, and model years 2024–2026 Chevrolet Traverse and GMC Acadia, and model years 2025–2026 Buick Enclave equipped with the LK0 2.5L turbocharged four-cylinder engine (collectively, the "Class Vehicles").

4. The Class Vehicles are equipped with a closed, sealed liquid engine cooling system (the "Cooling System") in which coolant is intended to circulate continuously between the engine and the radiator in a contained loop to regulate operating temperature and prevent overheating.

5. The image below depicts a typical automotive cooling system.[1]




[1] This image is a representative example for illustrative purposes only.

6. The Cooling System in the Class Vehicles suffer from the same design and/or manufacturing defects in the radiator hose quick-connect interface causing coolant to leak from the radiator hose connections early within the warranty period and the Class Vehicles' useful life (the "Defect").

7. GM knew about the Defect prior to the sale of the first Class Vehicle but did not warn Plaintiff and Class Members about the Defect, nor has it provided an adequate remedy, rendering GM's marketing of the Class Vehicles false and misleading.

8. Plaintiff, on behalf of himself and the proposed Class (defined below), seeks redress for GM's egregious and unconscionable misconduct, and asserts claims for: (1) violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.; (2) breach of express and implied warranties; (3) fraudulent omission/concealment; and (4) violations of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, *et seq.* and Georgia's Fair Business Practices Act. O.C.G.A. § 10-1-393, *et seq.*

## II. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act) because the proposed Class consists of more than 100 members, minimal diversity exists between Plaintiff and GM, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject-matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

11. This Court has general personal jurisdiction over GM because GM is registered to do business in the State of Georgia, therefore consenting to personal jurisdiction.

12. GM has also directed its business activities toward Georgia and this District, including marketing, selling, warranting, and servicing the Class Vehicles through authorized dealerships in Georgia.

13. GM intentionally availed itself of the privilege of conducting business in Georgia by placing the Class Vehicles into the stream of commerce with the expectation they would be purchased, registered, and operated in Georgia.

14. GM derives substantial revenue from vehicles sold, leased, and serviced in Georgia, including within this District.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including Plaintiff's purchase of the vehicle in Dawsonville, Georgia, and the manifestation and repair of the Defect in Georgia.

16. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because GM is subject to personal jurisdiction in this District and is therefore deemed to reside here for purposes of venue.

## III. PARTIES

**Plaintiff**

17. Plaintiff Jonathan Dixon is a Georgia citizen and resident of Forsyth County, Georgia, residing in Cumming, Georgia.

18. On March 16, 2024, Plaintiff purchased a new 2024 Chevrolet Colorado from John Megel Chevrolet, located in Dawsonville, Georgia.

19. Prior to purchasing his Class Vehicle, Plaintiff Dixon reviewed GM promotional materials, including sales brochures, the window sticker, GM's website, and interacted with at least one sales representative at John Megel Chevrolet without GM disclosing the Defect.

20. Through his exposure and interaction with GM, Plaintiff Dixon was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle.

21. When he purchased the vehicle, he believed, based on GM's marketing message, that he would be in a safe and dependable vehicle.

22. At no point before Plaintiff Dixon purchased his vehicle did GM disclose to him that his vehicle was not safe or dependable, or that it was equipped with a defective Cooling System.

23. The Defect creates an unreasonable risk of injury to Plaintiff Dixon, other Class Vehicle occupants, and others on the road.

24. In February 2026, Plaintiff Dixon first experienced the Defect at approximately 44,398 miles when the check engine light illuminated, and his vehicle exhibited a metal-on-metal grinding noise at slow speed.

25. Plaintiff Dixon presented his Class Vehicle for repair at John Megel Chevrolet on or about February 18, 2026.

26. Upon inspection, the dealership verified the check engine light caused by DTC P3075 and found the coolant level low.

27. The dealership technician pressure tested the system and found a leak at the quick-connect end of the upper radiator hose.

28. Plaintiff sought coverage for the repair but only received $100 in goodwill. Plaintiff was forced to pay $489.36 out-of-pocket for the repair. Plaintiff has not been reimbursed for this expense.

29. The dealership recommended replacing the upper radiator hose assembly and vacuuming the Cooling System.

30. The upper radiator hose quick-connect failure Plaintiff Dixon experienced is not covered by GM’s Special Coverage Program N262546590, which addresses only the lower radiator hose quick-connect seal on a separate, more limited set of vehicle models.

31. While GM issued Preliminary Information Service Bulletin PIT6494A in March 2026 acknowledging the same upper radiator hose quick-connect seal failure on the Colorado and Canyon, that bulletin provides warranty coverage only for vehicles still within the three-year/36,000-mile bumper-to-bumper warranty period, a period that had since expired on Plaintiff’s vehicle at 44,398 miles.

32. Plaintiff was therefore ineligible for any reimbursement or warranty coverage under either program, and bore the out-of-pocket cost of repair of $489.36.

33. As a result of GM's misconduct alleged herein, Plaintiff Dixon suffered injury in fact and lost money or property, including out-of-pocket costs to diagnose and repair his vehicle, and he did not receive the benefit of his bargain for a vehicle marketed as reliable and safe.

34. Plaintiff Dixon purchased a vehicle of a lesser standard, grade, and quality than represented, and did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.

35. The Defect has significantly diminished the intrinsic and resale value of Plaintiff Dixon's Class Vehicle.

36. Had GM disclosed the Defect, Plaintiff Dixon would not have purchased his Class Vehicle or would not have paid as much to do so.

37. Plaintiff Dixon would purchase a vehicle from GM in the future if Defendant's representations about the vehicle, including its safety and durability, were accurate.

**Defendant**

38. Defendant General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, Detroit, Michigan 48265.

39. The sole member and owner of General Motors LLC is General Motors Holding LLC.

40. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

41. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation, with its principal place of business in the State of Michigan and is a citizen of Delaware and Michigan.

42. At all relevant times, GM controlled the specifications of the radiator hose assemblies, quick-connect interfaces, and sealing components at issue; dictated service procedures for diagnosing and repairing coolant leaks; and controlled warranty and reimbursement policies applied to consumers.

# IV. FACTUAL ALLEGATIONS

## A. The Defect

43. The radiator coolant hose is a critical component of the Class Vehicles' Cooling System that circulates coolant between the engine and the radiator to regulate engine temperature and prevent overheating.

44. To accomplish this, vehicles traditionally use external hose clamps which provide continuous mechanical clamping force at the hose-to-radiator interface, as illustrated by the examples shown below.



45. The Cooling System in the Class Vehicles replaces this traditional clamp with a plastic quick-connect fitting that joins the hose to the radiator without the external clamping force provided by the traditional clamp.

46. Instead, the quick-connect in the Class Vehicles relies on precise fitting between the connector, the seal, and the radiator neck, as well as proper seating of the retaining clip within the groove.

47. The below image shows the upper radiator hose quick-connect fitting for the Vehicles.




48. Analysis by Plaintiff's expert consultant confirms that the quick-connect interface is defective such that the connection can degrade prematurely, lose sealing integrity, and allow coolant to leak at the hose-to-radiator interface.

49. When coolant leaks externally at the radiator-to-hose connection, coolant volume is reduced, impairing the Cooling System's performance.

50. Coolant loss can trigger warning messages and MILs, including the check engine light and set diagnostic trouble codes, such as P3075 – Engine Coolant Flot Too Low.

51. Coolant loss leads to engine overheating, reduced engine power/limp mode events, sudden engine disablement, and/or catastrophic engine damage.

52. The Defect can occur at low mileage and can cause catastrophic failure within warranty.

53. The Defect manifests unexpectedly and renders Class Vehicles inoperable, with little or no warning.

54. The Defect takes control of the vehicle away from the driver and prevents them from moving out of the way of oncoming danger or from moving with the flow of traffic.

55. The Defect creates a safety risk such that the Class Vehicles are not fit for their ordinary purpose and do not pass without objection in the trade, rendering them substantially less drivable, useable, safe, and valuable.

## B. <u>GM's Knowledge of the Defect</u>

56. GM fraudulently, intentionally, negligently, and/or recklessly concealed from Plaintiff and Class Members the Defect in the Class Vehicles, even

though GM knew or should have known of the design and/or manufacturing defects in the Class Vehicles.

57. GM became aware of the Defect through sources not available to Plaintiff and the other members of the Class, including, but not limited to: pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to GM's network of dealers and directly to GM, aggregate warranty data compiled from GM 's network of dealers, testing conducted by GM in response to consumer complaints, repair order and parts data received by GM from GM's network of dealers and suppliers, its investigation and field analysis of the Defect, its investigation and root cause analysis of failures in pre-Class Vehicles, and its issuance of Preliminary Information Bulletin PIT6494A and Special Coverage Program N262546590, identifying the degraded radiator hose seal as the cause of coolant leakage in the Class Vehicles.

**1. Pre-Release Testing**

58. GM knew or should have known about the Defect from the testing performed on the engines, the Cooling System, and radiator hose quick-connect assemblies in the Class Vehicles. Prior to the sale of any of the Class Vehicles, GM, like any other reasonable Original Equipment Manufacturer ("OEM") seeking to

manufacture and sell vehicles on the U.S. market–completed a multitude of analyses and testing that exposed the existence of the Defect.

59. GM and its suppliers perform various pre-production testing on new vehicle components, including most notably Failure Modes and Effects Analysis ("FMEA") and Design Validation Plan and Report ("DVP&R").

60. GM and its suppliers performed these tests, and others, on the Class Vehicles and, if performed with due care, each of these tests demonstrated that the relevant systems or components in the Class Vehicles would lead to failure of the quick-connect seal and the Cooling System.

61. FMEA tests methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail.

62. In testing the Cooling System components at issue here, FMEA testing would explore, among other things, how and under what conditions the radiator hose quick-connect fittings and sealing elements could fail, the conditions under which lip seal degradation and coolant leakage would occur, how likely failure was under different thermal cycling, pressure pulse, and chemical exposure conditions, and how likely each condition tested was to occur.

63. The purpose of the FMEA is to define, based on known and established engineering facts like those asserted by GM, potential risks of failures and rank them by severity, likelihood and ability to detect failure.

64. Any conditions resulting in failure, like those associated with the Defect would result in a "high risk" priority and draw additional and more extensive analysis and validation testing during the FMEA and DVP&R phases.

65. Given the reports of Cooling System seal failures in the Class Vehicles after sale, these processes were designed to show the various modes of failure caused by the Defect and confirm what Defendant already knew about the Defect.

66. The DVP&R phase includes an extensive battery of tests and other work necessary to validate the robustness of any design and includes three basic types of testing: bench scale, dynamometer, and vehicle/field testing. This testing is discussed below.

67. Bench scale testing is component-specific and establishes a strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions.

68. During this phase of testing, the Class Vehicles' Cooling System components, including the radiator hose quick-connect fittings and lip seals, were "bench tested," including being subjected to simulated thermal cycling, coolant pressure pulses, chemical exposure, and mechanical loading to confirm whether they

meet the sealing specifications and durability guidelines set by the supplier in coordination with GM. Discovery is expected to reveal that GM received the detailed results of this bench testing and resulting Technical Control Documents (TCDs) which outline the operating limitations of the quick-connect sealing interface along with the potential risks of premature seal degradation, including the Defect.

69. The bench testing of the Cooling System components confirmed what Defendant already knew about its design choice or its workmanship and materials—that the quick-connect sealing elements degrade prematurely under normal vehicle operating conditions and fail to maintain coolant-tight connections over the expected useful life of the vehicle.

70. Dynamometer testing is one of the most important types of testing to ensure durability and performance of the powertrain and its components.

71. In the dynamometer test, the powertrain operates under extreme conditions such as maximum temperatures, RPMs, or excessive vibration.

72. Dynamometer testing is intended to demonstrate powertrain robustness and reveal necessary improvements or flaws, such as the Defect.

73. The dynamometer testing revealed that the quick-connect sealing elements were prone to premature degradation under the temperature and pressure cycling conditions inherent to normal vehicle operation.

74. GM and its suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals.

75. GM tested the engines and the Cooling System in actual vehicles, both prototype vehicles and pre-production line vehicles. In these tests, vehicles are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public. These vehicle-specific development tests include mapping extreme operating conditions, which are the kinds of modes that manifest the Defect.

76. Through the rigors of these three phases of DVP&R testing, the Class Vehicles' Cooling System components, including the radiator hose quick-connect fittings and lip seals, were exposed repeatedly to the thermal cycling, pressure, and chemical conditions that cause the Defect to manifest.

77. GM admits it performs extensive pre-release testing of the Class Vehicles before they are sold.

78. Among other findings, GM's pre-production testing revealed that: (1) the quick-connect sealing elements used at the radiator hose interfaces are prone to premature loss of sealing integrity under normal vehicle operating conditions; (2) deficiencies in the seal material and/or the dimensional tolerances of the hose fitting geometry led to insufficient sealing performance over the expected life of the

vehicle; (3) these factors increased the likelihood of premature coolant leakage at the hose-to-radiator interface; and (4) the Class Vehicles were at significant risk of Cooling System failure due to this Defect.

79. During this testing, GM learned that the quick-connect sealing elements in the Class Vehicles' Cooling Systems were prone to premature degradation and failure under normal operating conditions, and that the existing lip seal design was insufficient to maintain coolant-tight connections over the expected useful life of the vehicle.

80. Due to the costs of redesigning the quick-connect interface or upgrading the seal specification, GM opted to conceal the Defect.

81. GM knew or should have known that the Defect was material to owners or lessees of the Class Vehicles, and that Plaintiff and Class Members could not reasonably discover the Defect on their own prior to purchasing or leasing the Class Vehicles.

82. GM had and continues to have a duty to fully disclose the true nature of the Defect to Plaintiff and Class Members, among other reasons, because the Defect poses an unreasonable safety hazard; because GM had and has exclusive knowledge or access to material facts about the Class Vehicles' Cooling Systems and quick-connect sealing components that were and are not known to or reasonably discoverable by Plaintiff and the other members of the Class; and because GM has

actively concealed the Defect from its customers at the time of purchase or repair and thereafter.

83. Specifically, GM (a) failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Defect; (b) failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their Cooling Systems were not in good working order, were defective and prone to failure, and were not fit for their intended purpose; and (c) failed to disclose and actively concealed the fact that the Class Vehicles were equipped with defective sealing components, despite the fact that GM learned of the Defect before it placed the Class Vehicles in the stream of commerce.

84. The Defect and its associated safety risks were concealed and actively suppressed in order to protect GM's corporate profits from loss of sales, purchase refunds, warranty repairs, adverse publicity, and brand disengagement.

85. Consumers were misled into believing their Class Vehicles had different qualities than what they purchased or leased, and as a result, were deprived of economic value, the benefit of their bargain, and overpaid for their Class Vehicles.

86. At all relevant times, in promotional materials, advertisements, and other representations, GM and its authorized dealers maintained that the Class Vehicles were safe, reliable, and made no reference to the Defect.

87. GM also engaged in a long-term advertising and branding campaign as a reliable vehicle manufacturer.

88. Plaintiff and Class Members, directly, and indirectly, were exposed to, saw or heard such promotional materials and advertisements prior to purchasing or leasing the Class Vehicles and had the reasonable expectation that their Class Vehicle would be safe and reliable.

89. These misleading representations about the Class Vehicles' reliability and safety were material to Plaintiff's and Class Members' ultimate decision to purchase or lease the Class Vehicles.

90. Notwithstanding GM's superior and exclusive knowledge of the Defect, it failed to disclose it to Plaintiff and Class Members at the time of purchase or lease of the Class Vehicles and made no mention of the Defect in its advertisements, promotional materials, and other representations.

**2. Consumer Complaints**

91. Federal law requires GM to monitor defects that can cause a safety issue and report them within five (5) days to NHTSA.

92. GM regularly monitors NHTSA complaints to meet reporting requirements under federal law. GM, therefore, has knowledge of the Defect due to the numerous consumer complaints, such as those made to NHTSA, as well as by other means.

93. GM has also publicly acknowledged monitoring consumer complaints and warranty data to evaluate product performance and is therefore on notice of the Defect through these internal monitoring channels.

94. Consumers who purchased or leased Class Vehicles from GM have filed a significant number of complaints with NHTSA reporting the Defect.

95. GM knew or should have known about the Defect and its associated risks through the voluminous consumer complaints filed with NHTSA as early as November 2024. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

96. The publicly filed complaints concerning these vehicles describe the safety dangers and reliability concerns present in the Class Vehicles due to the Defect.

97. The following example complaints filed by consumers with NHTSA demonstrate that the Defect is a widespread safety hazard that continues to plague the Class Vehicles to this day:[2]

98. On November 22, 2024, the owner of a 2023 Chevrolet Colorado submitted the following complaint to NHTSA:[3]

> Upper radiator hoses are failing. Failed at 40k miles due to manufacturer defect of the part. Seeing owners complain about them

---

[2] All NHTSA complaints cited herein are verbatim copies of the complaints accessible on NHTSA's website. All typographical or grammatical errors are original.

[3] NHTSA ID: 11626923.

leaking off the dealer lot and know 10+ that have had theirs fail around 30k miles.

99. On December 26, 2024, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[4]

> The contact owns a 2024 Chevrolet Traverse. The contact noticed liquid underneath the vehicle where the radiator system was located. The vehicle was taken to the dealer who diagnosed that the radiator and coolant system had failed. The radiator and coolant were replaced. After having the repair completed, the contact had the vehicle inspected for the DMV admission test and the vehicle was reported as failed. The vehicle was returned to the dealer who could not find the cause of the failed test. The vehicle had not been diagnosed or repaired. The manufacturer was not made aware of the failure. The failure mileage was 18,000.

100. On May 5, 2025, the owner of a 2023 Chevrolet Colorado submitted the following complaint to NHTSA:[5]

> Upper radiator hose rubber grommet failing at 22k. Had a severe coolant leak coming from top radiator hose blowing back onto hot motor which could have turned into a fire quickly. I was lucky! A lot of GMC Canyons and Colorado's are all reporting the same problem around 22k miles. It is currently at Grossman Chevy Old Saybrook, CT for repair.

101. On October 13, 2025, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[6]

> 2024 GMC Canyon Elevation trim 4x4 with 31,000 miles on it always had maintenance every 5k interval. I noticed an upper radiator hose leak significant enough to require a decent amount of coolant and decided to take it in to GMC to get it repaired. Mind you this repair is almost

[4] NHTSA ID: 11632380.
[5] NHTSA ID: 11658902.
[6] NHTSA ID: 11693216.

> $1,000 to get repaired with the hose itself only costing $148. It's disappointing to have such a new truck and have these kinds of problems and upon research there seems to be several others with the same problem relating to an O ring in the upper radiator hose. Considering the truck is routinely serviced more frequently than required I see this as an issue for someone to run out of coolant and possibly be stranded on the side of the road if gone unnoticed and needs to be properly addressed asap.

102. On October 17, 2025, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[7]

> Upper Radiator hose O ring defect Causing all 2023+ Chevorlet Colorados and 2023+ GMC to leak coolant in a brand new truck

103. On October 29, 2025, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[8]

> A leak in the upper radiator coolant intake hose has been found. This leak is the result of a bad rubber o-ring in the connection between the radiator and the hose. This has resulted in coolant regularly leaking from the vehicle causing power train issues, health and safety concerns where toxic coolant is leaking and environmental concerns. A loud "whooshing" noise was heard from the engine bay prior to eventually a check engine light being illuminated when the coolant level became low enough.

104. On November 3, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[9]

> After only having the vehicle for one year, we found a big puddle underneath our vehicle. Not knowing what this liquid was and just thinking that it was the air conditioning. We continue to drive it while driving at one afternoon. The car told me to stop immediately as my engine had overheat overheated. We are now stuck in a rental until

[7] NHTSA ID: 11694003.
[8] NHTSA ID: 11696360.
[9] NHTSA ID: 11697215.

> further notice due to the upper radiator hose needing replaced. It concerns me that a vehicle so new is out of order for so long that if it were to have any more issues, I would out of a vehicle again

105. On November 7, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[10]

> Coolant/Radiator Hose leaking - noticed leak on driveway , no messages or warnings , Leak is being reported on numerous chevy traverse vehicles, needs a recall before it becomes a safety concern

106. On November 7, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[11]

> I had my upper radiator hose leaking coolant after only owning this brand new vehicle about a year and half. Has less then 20,000 miles on it. I was able to get it into a Chevy dealer and they confirmed the leak. Seems the original part was defective. Was told I could take it home and drive it until the part came in(no eta on that) but to monitor the levels of coolant. Within two days I had a huge puddle of coolant in my driveway and had to bring it back to the dealer immediately. Thankfully I had coolant on hand and was able to refill the reservoir to make it to the dealer. This is a big concern because this is my wife's car that she uses primarily to transport our two young children around. Thankfully she didn't get stranded somewhere.

107. On November 7, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[12]

> My vehicle began to leak heavily from the front drivers side- under carriage. No warning lamps, On Star notifications came on but the vehicle was loosing a lot of coolant which could result in the engine overheating. I took it to the dealership and they diagnosed that I needed

---

[10]NHTSA ID: 11698057.
[11]NHTSA ID: 11698062.
[12]NHTSA ID: 11698117.

> a lower radiator hose- this needed to be replaced. The part that is needed is on back order until end of December

108. On November 10, 2025, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[13]

> Upper coolant hose started leaking two weeks ago.

109. On November 24, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[14]

> I was leaking coolant and took to the dealer. They say it's my upper radiator hose and it needs replaced but it's on a nationwide back order. I was at 42000 miles and was not covered under warranty. I'm reading that a ton of people having the exact same issue and nobody knows why are recall hasn't been issued on this. This can't be good for the environment having a bunch of traverse vehicles leaking coolant all over the country. Also a safety issue as your car can over heat!

110. On November 29, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[15]

> At around 22,000 miles my vehicle went into reduced power mode with no indication of why. This happened while I was going up a steep hill and the reduction of power slowed my vehicle dramatically, and I was nearly rear ended. The vehicle had no check engine light on until the next morning. I got the check engine light read at Autozone and they indicated that it was for a coolant pump. When i checked the coolant reservoir, it was empty. I added GM approved coolant and the check engine light turned off, but I had already set up for the vehicle to be serviced at Earnhardt GMC, so I still took it in on 9/19/25. They had my vehicle there for 5 days and said it was a valve that was causing a leak, and they had replaced it. On 10/12/25, my vehicle went into reduced power mode on the freeway again. I still had no check engine

---

[13] NHTSA ID: 11698479.
[14] NHTSA ID: 11697359.
[15] NHTSA ID: 11702001.

> light. I had to wait until the morning to take it into the dealership again. In the morning the check engine light came on again, so the dealership was able to read it and it was the same code as before. This time they only needed the vehicle over night, and said the coolant leak was from a bad water pump. on October 27th, my vehicle once again went into reduced power mode on the freeway, and again no check engine light. The next morning the check engine light was present and I again took my vehicle to Earnhardt GMC to have it diagnosed. Once again it had the same code. The next day I received a text message from my service advisor, that the issue was from the radiator hose and that they will be ordering it. So at this point I am in a rental car that was covered by my warranty. I asked if they had any updates 2 days later, and was told they didn't. On 11/3/25, while looking at a Facebook group for 2024 Traverse owners, I saw a number of people with the same issue I was having and getting month long ETAs for repair. It was later confirmed that my part will not be available until between 12/16/25-12/30/25. My vehicle is currently still at the dealership.

111. On December 3, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[16]

> Upper radiator hose leak with 20k miles. Coolant reservoir was completely emptied. Hose needed to be replaced on top of a parts not in stock. No warnings to overheating or coolant leak. Also Brakes squeal since day of purchase.

112. On December 3, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[17]

> The upper hose is leaking and vehicle is losing coolant

113. On December 3, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[18]

---

[16] NHTSA ID: 11702673.
[17] NHTSA ID: 11702730.
[18] NHTSA ID: 11702756.

> Radiator leaking fluid from top right of radiator. Hose is dry where it connects to radiator, but coolant is leaking down the right side of the radiator, starting at the top.

114. On December 3, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[19]

> Completely disgusted with Chevy traverse. Upper radiator hose busted and radiator leaks at seem, squeaky brakes since day one purchased then sensor on brakes went bad causing it to say brakes are less than they actually are says 18% and it's actually 88% caused the engine light to come on ppl can't afford a payment and be at the dealer all the time and without transportation. It's my only vehicle and I need it fixed but everyone says part is back ordered or something this is a shitty vehicle Chevy needs to pay to replace brakes sensor hoses and radiators even if it's past factory warranty these vehicles cost to much not to last past 36,000. Ridiculous there needs to be a recall this is becoming a very well known problem Chevy should have to cover to fix it and make it right and provide a vehicle while it's in the shop. Very upset with Chevy and it's quality and this needs to be recalled asap

115. On December 3, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[20]

> Coolant hose has broke twice. Happened 4/22/25 and 12/3/2025

116. On December 4, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[21]

> Engine overheating light comes on, car leaking fluid. Possible radiator or radiator hose. Unsafe to drive breaks are squeaky and bad.

---

[19] NHTSA ID: 11702803.
[20] NHTSA ID: 11702815.
[21] NHTSA ID: 11702904.

117. On December 4, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[22]

> Bought vehicle on 11/28/25. By 11/30/25, brakes squealing and large puddle of coolant in driveway. Took back to dealer on 12/1/25, told special radiator hose that is on backorder all over country. Unknown ETA.

118. On December 4, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[23]

> Squeaky breaks Coolant leak Engine heating warning Check enginelight comes on after each gas visit Car sounded super load when engine is running due to constant coolant leaks Car doesn't feel safe to drive with 4 young kids!

119. On December 4, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[24]

> My 2024 Traverse was delivered with defective third-row seat headrests that do not return to their normal upright position after being folded, compromising passenger head and neck protection in a collision. On October 28, 2025, the vehicle developed a coolant leak confirmed by the dealer, but repairs have been delayed due to a national parts backorder, creating a risk of engine overheating or sudden breakdown while driving. Additionally, the front brakes began squeaking excessively about one year into my ownership, and the brake pad wear sensor shows only 18% life remaining at 18,454 miles, which raises concerns about reduced braking efficiency and increased stopping distance. All issues have been reported to an authorized dealer and remain unresolved except for the third-row headrests. These conditions pose significant safety risks to occupants and other road users.

[22] NHTSA ID: 11702911.
[23] NHTSA ID: 11703041.
[24] NHTSA ID: 11703122.

120. On December 6, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[25]

> The radiator hose malfunctioned and began to leak fluids onto my garage floor for 7 straight days. -My safety as well as others on the road were at risk because at anytime my vehicle could have lost all coolant and overheated. -The problem was confirmed by the service team at my dealership when I dropped it off for diagnosis. -There was absolutely no warning lamps or messages prior to failure. The only symptom was the leaking from under the car on the front driver side. The issues first appeared on Saturday November 29th 2025.

121. On December 6, 2025, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[26]

> The upper radiator hose on some huge percentage of these trucks fail (mine has failed at just over 20K miles). You can check the Colorado Chevy forum, youtube, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and then they would get to it in 7-10 days. This is extremely unfair to the consumer who depends on these vehicles. This should absolutely be a recall item. You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more.

122. On December 7, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[27]

---

[25] NHTSA ID: 11703381.
[26] NHTSA ID: 11703437.
[27] NHTSA ID: 11703578.

> Engine light came on . Warning low coolant turn car off engine over heating. Fan still running after turning off. Happen several times. Serveral days. Took in in to dealership because still under warranty. No longer car available despite under warranty. Also breaks alerted low break pad life in around July 2025 and took it in the dealer and said it was a update not completed.

123. On December 8, 2025, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[28]

> The upper radiator hose on a significant number of these trucks is failing prematurely. In my case, the failure occurred at just over 35,000 miles. Numerous reports on owner forums (such as the Colorado Chevy / GMC Canyon forum), YouTube, and other platforms document the same issue, indicating this is not an isolated incident but a widespread defect. Because this hose is part of the cooling system, its failure can quickly lead to engine overheating and potentially catastrophic engine damage. The root cause appears to be an engineering flaw in the sealing method: GM uses a rubber seal instead of a durable, high-quality o-ring to connect the upper hose to the radiator. Despite the seriousness of this defect, my local GMC dealer informed me that since it is not currently a recall item they could only schedule service for the following week, requiring me to leave the truck with them for 7-10 days before repairs would be completed. This is unreasonable for consumers who rely on these vehicles daily. Given the safety implications and the potential for engine failure, this issue warrants immediate attention. It should be classified as a recall item. Thousands of examples are already documented online, and GM's own repair data would likely reveal thousands more instances of this same failure.

124. On December 8, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[29]

> My 2024 Chevy Traverse is leaking coolant within the radiator hose system. While driving on a busy interstate, the vehicle went into protective limp mode reducing acceleration, creating a dangerous

[28] NHTSA ID: 11703623.
[29] NHTSA ID: 11704670.

situation for myself to manage. A check engine light did come on with the reduced acceleration notice. I am having to add coolant to the vehicle constantly to drive it. Parts on our national back order now due to the huge influx of others experiencing similar issues. Dealership has confirmed leak - however I'm told it is not covered until manufacturer warranty and can be costly to repair!

125. On December 9, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[30]

Coolant radiator failure at 15,000 miles no available fix from Chevrolet

126. On December 15, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[31]

To date, I have brought the vehicle to the service department four times, primarily due to the check engine light and other critical malfunctions. Below is a summary of the incidents: First Visit (approx July 2024): The vehicle suddenly lost acceleration while I was in traffic, leaving me stranded in the roadway. This posed a serious safety risk. The vehicle remained in the shop for 28 days. Second Visit (September 29, 2024): Multiple warning lights illuminated, and several diagnostic codes were detected. Third visit (do not recall the issue): Will find work orders if needed Most Recent Visit (December 3, 2025): A coolant leak caused the temperature gauge to spike, resulting in the air conditioning shutting off due to overheating. The next day the check engine light came on. I had no warning prior to the guage spiking. In addition to these major issues, the following concerns remain unresolved: Brakes continue to squeal. The dealership advised this is normal and that front brakes wear faster. Reverse sensor activates randomly, causing the brakes to engage abruptly. Also the front crash sensor triggers without any obstruction ahead. The dealership recommended disabling this safety feature. These recurring problems raise serious safety concerns and significantly impact the reliability of the vehicle. The advice to

[30]NHTSA ID: 11704040.
[31]NHTSA ID: 11705151.

disable safety features is unacceptable and does not address the underlying issues.

127. On December 16, 2025, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[32]

> My car is leaking coolant. There is no warning light or anything. Had to be towed to the dealership. Dealership confirms the truck is not driveable and needs an upper radiator hose which is on backorder until January. There aren't any loaner vehicles according to the dealership.

128. On December 18, 2025, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[33]

> Noticed a coolant leak on drivers side and took to dealership was told was the upper radiator hose but was unable to make repairs due to national backorder and only suggestion was to drive until parts come in and keep a check on the coolant level, My truck only has 28,708 miles and shouldn't have to keep an eye on coolant level I feel that is very unsafe

129. On December 19, 2025, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[34]

> Visibly observed antifreeze / coolant leaking from top radiator hose where it connects to the radiator. Dealer replaced upper radiator o-ring but it's still leaking. At 17000 miles a service brake warning message showed up on information screen. Front brake rotors are warped. Dealer states normal wear on front brakes. Also the dealership stated the front left inner brake pad was down to 2mm of pad left. Wanted over $420 to turn rotors and replace pads. I inquired why the left front pads were worn so much than the right side. They stated this was normal!

[32] NHTSA ID: 11705402.
[33] NHTSA ID: 11705901.
[34] NHTSA ID: 11706121.

130. On December 22, 2025, the owner of a 2024 GMC Acadia submitted the following complaint to NHTSA:[35]

> The upper radiator hose, which is part of the vehicle's engine cooling system, failed prematurely. The component is available for inspection upon request, and documentation of the repair and replacement can also be provided. Failure of the upper radiator hose caused coolant loss, creating a risk of engine overheating and sudden vehicle disablement. This posed/poses a safety risk, particularly if the failure had occurred at highway speeds or in traffic, where an unexpected breakdown could endanger the driver and surrounding vehicles. The issue was confirmed by an authorized GMC dealership, which diagnosed the failed upper radiator hose and performed the replacement. This issue has also been reported by multiple owners of the same model year, indicating a recurring problem. The vehicle and failed component were inspected by an authorized GMC dealership. No inspection by police or insurance representatives was required, as this was a mechanical failure and not the result of an accident. Prior to the failure, symptoms included coolant loss and cooling system concerns, which ultimately required dealership diagnosis. Any warning indicators appeared shortly before the issue was identified, with little to no advance warning before the component required replacement.

131. On December 29, 2025, the owner of a 2024 GMC Acadia submitted the following complaint to NHTSA:[36]

> On or about I experienced the check engine light on the above vehicle. After checking, the issue has something to do with the low level in the coolant system. I took the vehicle to a Maguire Chevrolet dealership in Grand Island New York. They charged me $200.00 +tax for diagnosis. They found the Radiator hose was leaking and it isn't covered by the warranty or extended warranty. I took the GMC to another shop for repair. They were told by 3 dealerships the part is on back order and they do not know when it will be in. Just to be sure, I called the GMC Dealership in Rome New York where the VFW purchased the vehicle. I was told they were put of stock but there wasn't an issue. That was on

[35] NHTSA ID: 11706582.
[36] NHTSA ID: 11707528.

> 12/24/2025. the salesman said he would call me on Friday to verify the status of the hose needed. as of 12/29/2025 at 13:00Hrs there hasn't been a call back. My feeling is there must be an issue with the hose in question. The should be a recall and GM should repair the leaking part. [XXX] CFO Department of New York VFW. [XXX] [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

132. On December 30, 2025, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[37]

> Upper radiator hose leaks where it connects to radiator. 40k miles and my truck has no coolant

133. On December 31, 2025, the owner of a 2024 GMC Acadia submitted the following complaint to NHTSA:[38]

> Apparently many vehicles like mine and including mine have defective radiator hoses or a poor set up with routing causing issues with the hoses. They are developing cracks/leaks causing poor circulation in the cooling system as well as possible engine failure. In speaking to mechanics and reading forum posts, it is evident that this is a large scale issue.

134. On January 9, 2026, the owner of a 2025 Chevrolet Traverse submitted the following complaint to NHTSA:[39]

> The contact owns a 2025 Chevrolet Traverse. The contact stated that immediately after purchasing the vehicle, the vehicle experienced several electrical failures, including the On-Star module malfunctioning. The On-Star module was replaced twice. During the failures, the cruise control feature became inoperable, and the computer updates were not received. Additionally, the battery became drained several times, and the vehicle needed to be jump-started. The contact

---

[37] NHTSA ID: 11707894.
[38] NHTSA ID: 11708122.
[39] NHTSA ID: 11709852.

> also indicated the shark fin antenna had ejected from the vehicle while driving. The vehicle also abruptly stopped while driving on several occasions, and while driving, there was an abnormal metallic scraping sound coming from the engine compartment. The radiator hose had failed, causing coolant to leak from the vehicle. The hose was replaced, and the vehicle was repaired. The manufacturer was notified of the failures. The failure mileage was 44,000.

135. On January 9, 2026, the owner of a 2023 Chevrolet Colorado submitted the following complaint to NHTSA:[40]

> The upper radiator hose and gasket on numerous Colorado and Canyon trucks have failed prematurely. Mine has failed at 31k miles. Radiator hose leaks can cause engine overheating and failures while on roadways. Additional issues of leaking coolant on roadways and into the environment. Vehicle is scheduled to be viewed by dealership. Symptom which lead to diagnosing problems included rushing fluid sounds as air was introduced to the coolant line as well as an observable leak on the driver side where the radiator hose connects to the radiator.

136. On January 19, 2026, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[41]

> There are widespread reports of the O ring seals on the radiator and heater hoses failing and causing coolant leaks. These leaks are significant enough to render the vehicle inoperable and with no cabin heating or cooling. This could lead to life-threatening situations in adverse weather conditions. It could also create dangerous roadside failure situation in heavy traffic, particularly on interstate highways. Dealers are aware of the issue and are currently repairing vehicles under warranty. However some dealers are telling owners that the cooling system is not part of the engine and drivetrain, and therefor is not covered under the original factory warranty if the vehicle has exceeded the initial bumper to bumper warranty limits. Dealers are also telling owners that parts are on backorder due to high demand, and that repair wait times could take weeks. The vehicle is unsafe to operate with a

[40] NHTSA ID: 11710014.
[41] NHTSA ID: 11711833.

> known coolant leak. Video of leak (another owner) here. [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

137. On January 19, 2026, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[42]

> Upper radiator hose attachment is leaking due to faulty rubber gasket. This comes up across GMC Canyon groups on Facebook 10 times a day. It is happening to ALL of them mainly pre 2025 on 3rd gens. Part is on back order at all GMC dealers due to so much volume of issue. Happening as early as 10k-20k miles on brand new trucks causing over heating issues due to coolant leaking out. Hopefully a recall for the part is done before engines start blowing.

138. On January 19, 2026, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[43]

> Upper radiator hose is leaking

139. On January 26, 2026, the owner of a 2023 Chevrolet Colorado submitted the following complaint to NHTSA:[44]

> The upper radiator hose on some huge percentage of these trucks fail (mine has failed at just over 37K miles). You can check the Colorado Chevy forum, youtube, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and then they would get to it in 7-10 days. This is extremely unfair to the consumer

[42]NHTSA ID: 11711886.
[43]NHTSA ID: 11711891.
[44]NHTSA ID: 11713387.

> who depends on these vehicles. This should absolutely be a recall item. You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more

140. On February 3, 2026, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[45]

> The car has a check engine light. Code reads P3075. The app shows an Engine cooling system error. Please schedule service now. The dealer diagnosed the issue: the coolant pipe to the radiator has failed and needs to be replaced. The part is on backorder, and there is no ETA for the repair.

141. On February 5, 2026, the owner of a 2025 GMC Canyon submitted the following complaint to NHTSA:[46]

> Upper radiator hose leaking coolant

142. On February 12, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[47]

> Radiator hose failed in under 1.5 Years on 2024 Chevy Colorado. Parts are back ordered for months, this is clearly a manufacture defect that could lead to overheating the engine and engine damage and failure

143. On February 14, 2026, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[48]

> Upper radiator hose leak.

---

[45] NHTSA ID: 11715306.
[46] NHTSA ID: 11715838.
[47] NHTSA ID: 11717661.
[48] NHTSA ID: 11717978.

144. On February 14, 2026, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[49]

> Radiator inlet hose leaked which caused low coolant. Check light alerted. Replace the hose. Parts are on backorder. Also had a recall on the emergency brake assist. I took this in for the recall however the alert assist still goes off.

145. On February 17, 2026, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[50]

> Upper radiator hose gasket leaks at connection point to radiator and no gasket replacement part. GMC forces you to buy entire hose

146. On February 17, 2026, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[51]

> Top radiator hose is leaking coolant. Radiator hose O ring appears to be faulty.

147. On February 19, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[52]

> upper radiator fitting is leaking, Chevy is replacing the radiator and the hose

148. On February 19, 2026, the owner of a 2024 GMC Acadia submitted the following complaint to NHTSA:[53]

> In the process of taking my daughter to the emergency room I receive a dash notification on my recently purchased 2024 GMC Acadia "car

[49] NHTSA ID: 11717993.
[50] NHTSA ID: 11718399.
[51] NHTSA ID: 11718457.
[52] NHTSA ID: 11719002.
[53] NHTSA ID: 11719104.

> overheating, possible engine failure". My gauges were within normal range and being that I was in an emergency I kept traveling. Leave hospital to head home the error message is gone. The following Monday, January 5th, heading in to work I receive the same error message on my dash "car overheating, possible engine failure". Drove to the nearest mechanic, left my car, and they discover a leak in the upper radiator hose. They call with bad news that the part is on nationwide back order. GM admitted to a faulty design, in the process of redesign. A SPAC case with a local GM dealership was opened. GM would expedite my case if I towed to a GM dealer. I would have to pay for the tow. And just how can my case be expedited if the part isn't available? It can't. I was told the redesigned hose is going on the new models currently being built. I have lost all faith in GM. Today is February 19th and my car is still at the mechanic with no ETA on part delivery. I called every GM dealership parts department within 100 miles and get the same response, "we have two hoses with four cars needing it, we have 4 hoses with 8 cars needing it, the hose is hell to find, etc.". Why has GM not issued a recall on the upper radiator hose. If you have a 2024 GMC Acadia, you will incur this same issue.

149. On February 21, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[54]

> Check engine light appeared and fans kicked on loudly. Stayed on even after shutting the vehicle off. Vehicle is a 2024 with only 28,639 miles on it. Upper radiator hose was leaking and would not seal. Took to dealership for repair and replacement. Was informed it was the 3rd Chevy Colorado this week with this issue! Was stunned. Further internet research found a staggering number of forum posts with this same issue. This is a recall-worthy issue at this point. Please consider issuing a recall based on the safety issues this may pose if engines seize or overheat as well as the sheer number of the same reported incidents.

150. On February 25, 2026, the owner of a 2023 Chevrolet Colorado submitted the following complaint to NHTSA:[55]

---

[54] NHTSA ID: 11719632.
[55] NHTSA ID: 11720352.

> Radiator hose near failure, lose of coolant could be catastrophic. Upper Radiator hose quick disconnect O-ring inside failed.

151. On February 25, 2026, the owner of a 2023 GMC Canyon submitted the following complaint to NHTSA:[56]

> The upper radiator hose on some huge percentage of these trucks fail (mine has failed at just over 37K miles). You can check the Colorado Chevy and GMC Canyon forums, youtube, Facebook, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and that I am responsible for the repair. This is extremely unfair to the consumer who depends on these vehicles. This should absolutely be a recall item. You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more.

152. On February 27, 2026, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[57]

> Upper radiator hose connection to radiator is faulty causing leak of coolant. Yes it is available for inspection upon request. Truck began to run cooling fan at full speed in the middle of winter with no warnings of high heat or low coolant. After two weeks, check engine light finally cut on to indicate low coolant flow. Coolant reservoir was subsequently checked and found to be completely empty. It is apparent this reservoir had been extremely low / empty for at least two weeks with no warnings. Without proper warning and leaking coolant, truck could have overheated. Should this had happened in dead of summer, truck could have very well overheated with no warning. The problem was investigated and confirmed by dealer as leaking coolant at the connection of the upper radiator hose to the radiator. Was quoted $983 to replace the hose. No warning lights appeared until issue had been

[56] NHTSA ID: 11720437.
[57] NHTSA ID: 11721052.

ongoing for over two weeks. A quick search of "GMC Canyon Upper Radiator Hose" will reveal many identical occurrences of this issue. This is a safety hazard / design flaw that GM is not acknowledging and is putting the burden on the vehicle owners for their own issue.

153. On March 2, 2026, the owner of a 2024 Chevrolet Traverse submitted the following complaint to NHTSA:[58]

> Vehicle overheated while driving on interstate in 32F weather. No warnings lights warning of low coolant - only noticed climbing temperature gauge and cooling fans running at full speed. Pulled over and drove slowly to nearest exit with service station. Found coolant reservoir completely empty but with no obvious leaks. Chevrolet dealer diagnosed leaking radiator hose - typical with numerous social media report of similar issue with the 2024 model year Chev Traverse Generation 3.

154. On March 4, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[59]

> Copied this from a forum and it's the same thing for me. I'm editing to fit my unique situation. This is an $800 repair at my dealer for a $40 part! 5 day backorder so I'm without a vehicle. The upper radiator hose on some huge percentage of these trucks fail (mine has failed at 37500 miles). You can check the Colorado Chevy forum, youtube, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and then they would get to it in 7-10 days. This is extremely unfair to the consumer who depends on these vehicles. This should

[58] NHTSA ID: 11721396.
[59] NHTSA ID: 11722116.

> absolutely be a recall item. You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more.

155. On March 5, 2026, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[60]

> Radiator Hose began to leak coolant. Faulty radiator hose. This could have caused engine failure and potentially caused an accident or may have put others at risk for hazards. No warning other strange sound. Inspected by authorized dealers service center.

156. On March 5, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[61]

> Upper radiator hose leak with 36,750 miles(just out of warranty) 3 days after it was at dealer for oil change and replacing the heat shield. Apparently VERY common in these vehicles which says they are aware but haven't FIXED the issue, should be a RECALL!!

157. On March 6, 2026, the owner of a 2023 Chevrolet Colorado submitted the following complaint to NHTSA:[62]

> The upper radiator hose on some huge percentage of these trucks fail (mine has failed at just over 20K miles). You can check the Colorado Chevy forum, youtube, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and then they would get to it in 7-10 days. This is extremely unfair to the consumer who depends on these vehicles. This should absolutely be a recall item.

[60] NHTSA ID: 11722277.
[61] NHTSA ID: 11722321.
[62] NHTSA ID: 11722505.

> You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more.

158. On March 7, 2026, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[63]

> Coolant Leaking at 22K miles, smell of coolant, check engine light on and off 2X's. Coolant evidence on driveway and in engine cabin. Known condition for GM Model. No parts available for replacement. No recall for issue.

159. On March 9, 2026, the owner of a 2024 GMC Canyon submitted the following complaint to NHTSA:[64]

> Coolant leak caused by known manufacture defect in upper hose assembly causes coolant to drain and engine to overheat. CEL only comes on when coolant is almost gone. GMC refuses to cover the known issue after 36k miles.

160. On March 11, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[65]

> The upper radiator hose on some huge percentage of these trucks fail (mine has failed at just over 20K miles). You can check the Colorado Chevy forum, youtube, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and then they would get to it in 7-10 days. This is extremely unfair to the consumer who depends on these vehicles. This should absolutely be a recall item.

[63] NHTSA ID: 11722659.
[64] NHTSA ID: 11722976.
[65] NHTSA ID: 11723733.

> You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more.

161. On March 18, 2026, the owner of a 2025 Chevrolet Colorado submitted the following complaint to NHTSA:[66]

> The upper radiator hose on some huge percentage of these trucks fail (mine has failed at just over 5k miles). You can check the Colorado Chevy forum, youtube, etc., et al, and find plenty of instances where this has failed. As this is the cooling system, it can cause the engine to overheat and potentially ruin the engine. The flaw seems to be an engineering issue with the rubber seal they use (instead of a high quality o-ring) to seal the upper hose to the radiator. Additionally, since this can cause engine failure it should be addressed immediately. Instead, my local Chevy dealer, since its not a recall item, said they could schedule a time next week for me to LEAVE the truck and then they would get to it in 10-14 days. This is extremely unfair to the consumer who depends on these vehicles. This should absolutely be a recall item. You can find 1000's of examples online and if you can pull GM repair data, I'm sure you'll find 1000's more.

162. On March 19, 2026, the owner of a 2024 GMC Acadia submitted the following complaint to NHTSA:[67]

> We purchased our 2024 Acadia in June 2025. Since we have had the vehicle, it has been in the shop going on 6 times. First the sunroof seal came off, then the antenna cover fell off, the driver side rear panel had to be replaced because it was coming off. Once all this was done then the vehicle started leaking transmission fluid, took it to the dealer to get fixed, once we get it back the coolant starts leaking from the radiator hose, took it in to get repaired, now there is knocking noise coming from the engine/hood. Every time we take it in to get repaired a new problem pops up. We purchased the vehicle to have a safe way to get our kids around and it has been nothing but a headache and run around

[66] NHTSA ID: 11725209.
[67] NHTSA ID: 11725673.

> from the dealership. GMC really needs to resolve this issue. Parts seem to be on never-ending backorder with no ETA.

163. On March 27, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[68]

> I have a 2024 Chevy Colorado Trail Boss that needs an Upper Radiator Coolant Hose. But apparently this is on nationwide backorder because although there is not a recall GM put a bulletin out they are aware of the issue that appears to be a degraded seal inside hose fitting so the whole hose needs replacing. I live in [XXX] and it is not available here and I have called OH, [XXX] , [XXX] and other state dealerships and Noone will sell that part because of the backorder. My truck has 40k miles. And every dealer I called this is a huge issue with these trucks. So it is not a wear issue when it is on nationwide backorder and it'll take 1-2 weeks +/- to get. My warranty won't cover as they say it is a wear part and no recall. So how can there be no recall on a nationwide issue with these trucks. My truck cant be driven right now due to check engine light, low coolant, leaking hose, fan blowing high, no heat and this is all related to this backordered part. Someone told me to report this issue so that is what I am doing now. Again this should be an active recall. Thank you INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

164. On March 30, 2026, the owner of a 2024 Chevrolet Colorado submitted the following complaint to NHTSA:[69]

> Coolant leaking from the upper radiator inlet hose connection.

165. Upon information and belief, GM monitors social media platforms and online forums, including GM forums.

---

[68]NHTSA ID: 11727584.
[69]NHTSA ID: 11728050.

166. GM is and was aware of the numerous, widespread complaints about the Defect in the Class Vehicles.

167. GM knew that the Defect was present in all Class Vehicles but has failed to recall the Class Vehicles or provide an adequate remedy.

168. GM's unconscionable acts deprive Class Members of an adequate remedy, if one is devised and implemented.

169. The Defect renders the Class Vehicles inoperable and creates an unreasonable risk of injury or death to Plaintiff, Class Members, and others, and, thus, the Class Vehicles are not fit for their ordinary purpose.

### 3. Warranty Data

170. GM knew about the Defect from its warranty data.

171. Per the TREAD Act, GM tracks customer complaints, vehicle diagnoses, and repairs from dealership technicians in a single, aggregated database.

172. GM employs persons who monitor the database for repair trends, and engineering and management staff review such trends in regular meetings.

173. For every one complaint filed with NHTSA, GM received hundreds or thousands of related warranty claims.

174. Given that the NHTSA complaint record for the Class Vehicles reflects dozens of filed complaints beginning as early as late 2024, GM almost certainly

received a substantially larger volume of corresponding warranty repair orders identifying the same upper radiator hose quick-connect seal failure.

175. GM has likely received thousands of warranty claims related to the Defect from the start of production.

176. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analyses, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, consumer complaints to NHTSA, public consumer complaints made online, and the testing performed in response to the consumer complaints, GM knew the Defect was present in all Class Vehicles, but it has not disclosed the Defect or provided an adequate repair to all Class Vehicles.

177. GM's halfhearted and unconscionable acts deprived and continues to deprive Plaintiff and Class Members of the benefit of their bargain.

178. Had Plaintiff and Class Members known what GM knew about the Defect, they would not have purchased their Class Vehicles or certainly would have paid less to do so.

**4. GM's Preliminary Information Service Bulletin**

179. In March 2026, GM issued Preliminary Information Service Bulletin PIT6494A, covering model years 2023–2026 Chevrolet Colorado and model years 2023–2026 GMC Canyon.

180. The bulletin states that customers may report a visible coolant leak or low coolant level at the overflow reservoir; or that technicians may observe coolant leaking from the upper radiator inlet hose connection and DTC P3075 (Engine Coolant Flow Too Low) stored in the Engine Control Module.

181. The bulletin further states that "[t]he condition may be caused by coolant leakage at the upper radiator hose quick-connect fitting due to a degraded inlet hose seal."

182. The bulletin confirms that "[t]his leakage originates from the radiator inlet hose seal itself and is not the result of a radiator failure," and that "[s]eal wear may present with varying levels of residue or buildup depending on vehicle usage and operating environment."

183. The bulletin's cause section is a direct admission by GM of the Defect at issue in this case.

184. The bulletin's prescribed correction requires the technician to drain the Cooling System, remove the radiator inlet hose, and reinstall or replace the hose.

185. The bulletin provides warranty coverage only for vehicles repaired "under the Bumper to Bumper coverage."

186. Vehicles outside the three-year/36,000-mile bumper-to-bumper warranty period, including Plaintiff's 2024 Colorado at 44,398 miles, receive no coverage under the bulletin.

**5. GM's Special Coverage Program**

187. GM also issued Special Coverage Program N262546590 in April 2026, limited to model years 2024–2026 GMC Acadia and Chevrolet Traverse and model years 2025–2026 Buick Enclave.

188. The Special Coverage describes the condition as coolant leaking "from the radiator hose quick connect at the radiator inlet."

189. The Special Coverage is limited and incomplete in multiple respects.

190. First, it does not include the Chevrolet Colorado or the GMC Canyon, which suffer from the same Defect.

191. Second, the Special Coverage addresses only the lower radiator hose quick-connect, at the bottom of the radiator.

192. The upper radiator hose quick-connect, which is a separate fitting at the top of the radiator connecting to the engine, receives no coverage whatsoever.

193. Upper hose failures like the one Plaintiff experienced are entirely outside the program's scope.

194. Third, even for the lower hose connection the Special Coverage does cover, it does not fix the underlying Defect.

195. Instead, it replaces the seal with the same quick-connect fitting equipped with a seal of the same lip-type geometry.

196. GM neither disclosed the full extent of the Defect nor provided a repair that resolves the deficiency shared by both connections.

### 6. GM Touted the Safety, Quality, and Reliability of the Class Vehicles, Concealing the Defect

197. GM's overarching marketing message across its brands is that its vehicles are safe, reliable, and dependably engineered.

198. GM’s message is pervasive and uniform, and material to consumers' purchase decisions, being conveyed in television commercials, online advertising, dealership materials, social media, vehicle brochures, and press releases.

199. This marketing conceals the Defect, which can cause sudden and unexpected coolant loss, engine overheating, and vehicle disablement.

200. GM's safety and reliability marketing was designed to make consumers believe that this Defect would not happen.

201. On its corporate "About" webpage, Chevrolet states: “The number one job of any car, truck or SUV is to get you where you need to go. We take this responsibility seriously, engineering vehicles that are recognized and awarded for

their quality, reliability and dependability. And it's all to help you feel confident from point A to B and all the way to Z."[70]

202. In its 2023 Colorado marketing materials, Chevrolet specifically highlighted the 2.7L turbocharged engine, touting that the engine incorporates "materials used in diesel engines to deliver the durability customers expect" and is designed to "optimize performance and refinement."[71]

203. GMC markets its vehicles, including the Canyon and Acadia, under the brand promise of "Professional Grade"—a phrase GMC uses pervasively in its advertising, brochures, dealer materials, and press releases to communicate that its vehicles are built to a higher standard of quality, durability, and dependability than ordinary vehicles.[72]

204. Buick markets its vehicles, including the Enclave, with a focus on refined safety, dependability, and attainable luxury.

205. Buick's official website states: "Your safety is our greatest priority, and the Enclave is designed and engineered with that in mind."

---

70 https://www.chevrolet.com/about (last visited May 11, 2026).

71 https://news.chevrolet.com/newsroom.detail.html/Pages/news/us/en/2022/jul/0728-colorado.html (last visited May 11, 2026).

72 https://www.gmc.com (last visited May 11, 2026).

206. Buick further markets the Enclave as reflecting "GMC's commitment to quality and durability," noting that Buick is "[r]ecognized by J.D. Power as the #1 mainstream brand for dependability."[73]

207. GM never disclosed the Defect, or even the existence of the quick-connect interface's known failure mode, in any of its advertising, brochures, dealer materials, press releases, or consumer-facing communications.

208. Plaintiff and the other Class Members, as any reasonable consumers would, justifiably made their decisions to purchase or lease Class Vehicles based in material part on GM's misleading marketing, including affirmations of fact, promises, and representations, all of which omitted any disclosure of the Defect.

209. Had GM disclosed the Defect, Plaintiff and Class Members would not have purchased the Class Vehicles or would have paid less to do so.

### 7. GM Dealers Are GM's Agents and Plaintiff and Class Members Are Third Party Beneficiaries

210. GM controls its dealerships, and the dealerships act for the benefit of GM.

211. Specifically, GM controls the dealerships' sales of Class Vehicles in material respects: GM sets the warranty terms and coverage periods that dealers communicate to consumers; GM dictates the diagnostic procedures and repair protocols dealers must follow for warranty claims; GM determines which repairs

[73] https://www.buick.com/suvs/previous-year/enclave (last visited May 11, 2026).

qualify for warranty reimbursement and at what labor rates; GM controls the parts supply chain and part availability for warranty repairs; and GM instructs dealers how to respond to consumer complaints about defects, including the Defect.

212. When dealers present warranty documentation to consumers and perform warranty repairs on Class Vehicles, they do so as agents of GM and for GM's benefit. These warranty obligations run directly to consumers, not to dealers.

213. GM "sells" the vehicles to dealerships.

214. Plaintiff and Class Members are third-party beneficiaries of these sales contracts between dealerships and GM because the terms of the contracts, such as the warranties, are for the benefit of the end user, not the dealerships, and GM designed, manufactured and marketed the Class Vehicles intending that they would be purchased by consumers such as Plaintiff and Class Members.

**8. GM Received Pre-Suit Notice Multiple Times and in Multiple Ways**

215. GM possessed comprehensive and exclusive awareness of the Defect, as outlined above.

216. Due to GM's thorough understanding of the Defect, the concealed nature of the Defect, and GM's proven inability to address it, any further requirement for notice would be pointless.

### 9. Applicable Warranties

217. GM issued a New Vehicle Limited Warranty for the Class Vehicles. GM issued its Limited Warranty for the benefit of Plaintiff and Class Members, and for the purpose of persuading Plaintiff and Class Members to purchase the Class Vehicles.

218. GM provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

219. The Class Vehicles sold and leased by GM included a written express warranty, which provides a 3-Year/36,000-Mile New Vehicle Limited Warranty, plus a 5-Year/60,000-Mile Powertrain Limited Warranty.

220. GM instructs vehicle owners and lessees to take their Class Vehicles to a GM-certified dealership for warranty repairs.

221. Many owners and lessees have presented their Class Vehicles to GM-certified dealerships with complaints arising from the Defect and have been denied a free repair.

222. GM has evaded its warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective, and (2) refusing to perform and/or failing to timely issue adequate repairs to correct the Defect.

223. GM's warranty fails in its essential purpose because the company has failed to offer an effective and permanent repair for the Defect.

224. GM simply replaces defective radiator hoses and seal/O-ring and other failed components with equally defective radiator hoses and seal/O-ring and other failed components and fails to correct and/or properly diagnose the underlying cause.

225. GM has notice of its breach and fraud based on its actual and exclusive knowledge of the Defect.

226. Moreover, GM's failure to effectively repair the Defect makes any notice requirement futile.

227. Both warranties are applicable to the Defect; however, GM has failed to correct the issue.

228. Under the terms of the New Vehicle Limited Warranty, GM is required "to correct any vehicle defect related to materials or workmanship occurring during the warranty period[.]"

229. The New Vehicle Limited Warranty period begins "on the date the vehicle is first delivered or put in use[.]"

230. Buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

231. The warranty is transferable to subsequent owners of the Class Vehicles during the warranty period.

232. GM's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable here.

233. GM's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect.

234. The time limits contained in GM's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class members.

235. Among other things, Plaintiff and other Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM.

236. A gross disparity in bargaining power existed between GM and Plaintiff and other Class Members, and GM knew of the Defect at the time of sale.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

237. Plaintiff and the other Class Members could not have discovered through the exercise of reasonable diligence that their Class Vehicle was defective within the time period of any applicable statutes of limitation.

238. Neither Plaintiff nor the other Class Members knew or could have known of the Defect in their Class Vehicles.

### B. Fraudulent Omission Tolling

239. Throughout the time period relevant to this action, GM concealed from and failed to disclose to Plaintiff and the other Class Members vital information about the Defect described herein.

240. GM kept Plaintiff and the other Class Members ignorant of vital information essential to the pursuit of their claims.

241. As a result, neither Plaintiff nor the other Class Members could have discovered the defect, even upon reasonable exercise of diligence.

242. Specifically, since 2022, GM has been aware that the radiator hose quick-connect sealing components installed in the Class Vehicles were defective and prone to premature coolant leakage.

243. Despite its knowledge of the Defect, GM failed to disclose and concealed, and continues to conceal, this critical information from Plaintiff and the other Class Members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

244. GM affirmatively and actively concealed the Defect when it continued marketing the Class Vehicles and introducing new vehicles equipped with the same defective quick-connect sealing components, despite knowing that those components were defective.

245. Plaintiff and the other Class Members justifiably relied on GM to disclose the Defect in the Class Vehicles that they purchased or leased, because that Defect was hidden and not discoverable through reasonable efforts by Plaintiff and the other Class Members.

246. Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiff and the other Class Members have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

**C. Estoppel**

247. GM knew about the Defect since at least 2022.

248. However, GM did not disclose the Defect to Plaintiff or the other Class Members, nor did GM warn Plaintiff and Class Members of the dangers of the Defect.

249. Instead, GM continued to mass-market the Class Vehicles solely for the purpose of generating revenues for GM's benefit.

250. GM still has not released a countermeasure to remedy the Defect.

251. Because of GM's unwillingness to provide adequate repairs, Plaintiff and Class Members were led to believe that no problem existed or that the issue was resolved, only to find out it would later fail again.

252. GM was merely replacing defective components with other equally defective components, rather than eliminating the Defect for good.

253. GM was under a continuous duty to disclose to Plaintiff and the other Class Members the true character, quality, and nature of the Class Vehicles.

254. GM knowingly concealed the true nature, quality, and character of the Class Vehicles.

255. Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

256. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and all others similarly situated. The proposed Class is defined as:

> Georgia Class: Plaintiff seeks to represent a Georgia Class, defined as all persons who purchased or leased a Class Vehicle in the State of Georgia (the "Georgia Class").

257. Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class may be expanded or narrowed by amendment or amended complaint or narrowed at class certification.

258. Excluded from the Class are GM and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the

judicial officers, and their immediate family members; and Court staff assigned to this case.

259. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

**A. Numerosity – Federal Rule of Civil Procedure 23(a)(1)**

260. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.

261. While Plaintiff is informed and believes that there are thousands of Class Members, the precise number of Class Members is unknown to Plaintiff but may be ascertained from GM's books and records.

262. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**B. Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**

263. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

1. whether the Class Vehicles contain the Defect;

2. whether GM knew or should have known about the Defect before selling the Class Vehicles;
3. whether GM had a duty to disclose the Defect;
4. whether GM breached its express and implied warranties;
5. whether GM violated state and federal consumer protection laws; and
6. what the appropriate measure of damages is.

**C. Typicality – Federal Rule of Civil Procedure 23(a)(3).**

264. Plaintiff's claims are typical of the other Class Members' claims because Plaintiff and the other Class Members purchased or leased Class Vehicles with a uniform defect arising from the same or substantially similar Cooling System and seal/O-ring design and specifications relevant to the Defect, and Class Members suffered the same injury stemming from the same Defect.

265. Neither Plaintiff nor the other Class Members would have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known of the Defect in the Class Vehicles.

266. Plaintiff and the other Class Members suffered damages as a direct proximate result of the same wrongful practices in which GM engaged.

267. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members.

268. Plaintiff's claims are typical of those of Class Members who own or lease other Class Vehicle models because those vehicles share the same or substantially similar defective radiator hose quick-connect sealing design as alleged herein.

**D. Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**

269. Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

270. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

**E. Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**

271. GM has acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole.

### F. Superiority – Federal Rule of Civil Procedure 23(b)(3).

272. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

273. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for the Class Members to individually seek redress for GM's wrongful conduct.

274. Even if the Class Members could afford litigation the court system could not.

275. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

276. For this case, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301)
### (Individually and on behalf of the Georgia Class)

277. Plaintiff incorporates the allegations from the preceding paragraphs if fully set forth herein.

278. Plaintiff makes this claim individually and on behalf of the Georgia Class.

279. The Court has jurisdiction under 28 U.S.C. § 1332(a)–(d).

280. The Class Vehicles sold as new are "consumer products" under the Magnuson-Moss Warranty Act.

281. Plaintiff and the Class are "consumers" within the meaning of the Act. They are consumers because they are people entitled by applicable state law to enforce implied warranties against GM.

282. GM is a "supplier" and "warrantor" under the Act.

283. The Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

284. GM provided Plaintiff and the Class with an implied warranty of merchantability for the Class Vehicles, an "implied warranty" under the Act.

285. As part of that implied warranty, GM guaranteed that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

286. GM breached its implied warranties and is thus liable to Plaintiff and the Class under the Act.

287. The Class Vehicles share a common defect in that they are equipped with the same defective quick-connect hoses, which can suddenly fail during normal operation, leaving occupants of the vehicles vulnerable to crashes, serious injury, and death at highway speeds.

288. In its capacity as a warrantor, GM had knowledge of the Defect inherent in the Class Vehicles.

289. Any effort by GM to limit the implied warranties that would exclude coverage for Class Vehicles is procedurally and substantively unconscionable.

290. Plaintiff and the Class have had sufficient direct dealings with GM, its agents, or both to establish privity of contract.

291. Privity is not needed here because Plaintiff and the Class are intended third-party beneficiaries of contracts between GM and its dealers.

292. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles.

293. The warranty agreements were, after all, designed for and intended to benefit consumers.

294. Privity is not needed because the Class Vehicles are dangerous instrumentalities.

295. Under the Act, Plaintiff and the Class are entitled to bring this class action and are not required to give GM notice or opportunity to cure until the Court determines the representative capacity of Plaintiff under Rule 23.

296. Plaintiff and the Class would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments they have made. Plaintiff and the Class have not re-accepted their Class Vehicles by retaining them.

297. The amount in controversy for Plaintiff and the Class Members' individual claims meets or exceeds $25.

298. The amount in controversy of this action exceeds $50,000 (exclusive of interest and costs) by a wide margin.

299. Plaintiff alone incurred $586.11 in out-of-pocket repair costs.

300. Consumer complaints in the NHTSA record reflect repair costs ranging from approximately $586 to $983 per vehicle for upper radiator hose replacement.

301. The proposed Class consists of thousands of owners and lessees of Class Vehicles across the United States.

302. Even at the low end of per-vehicle repair costs, the aggregate damages of the Class substantially exceed $50,000.

303. Plaintiff, individually and on behalf of all other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

304. The Act also entitles Plaintiff and the Class to recover their aggregate costs and expenses (including attorneys' fees) that are reasonably incurred in the commencement and prosecution of this civil action.

**COUNT 2**
**Violations of Georgia's Uniform Deceptive Trade Practices Act**
**(O.C.G.A. § 10-1-372)**
**(Individually and on behalf of the Georgia Class)**

305. Plaintiff incorporates the allegations from the preceding paragraphs as if fully set forth herein.

306. Plaintiff makes this claim individually and on behalf of the Georgia Class.

307. Plaintiff claims under Georgia's Uniform Deceptive Trade Practices Act are "in addition to" and thus not duplicative of their warranty claims.

308. GM has engaged in deceptive trade practices under O.C.G.A. § 10-1-372(a)(5) by representing that the Class Vehicles have "characteristics," "uses," or "benefits" when the Class Vehicles lack those characteristics, uses, or benefits.

309. GM has engaged in deceptive trade practices under § 10-1-372(a)(6) by representing that the Class Vehicles are of a "particular standard, quality, or grade" when the Class Vehicles are not of that standard, quality or grade.

310. GM has engaged in deceptive trade practices under § 10-1-372(a)(9) by advertising the Class Vehicles with intent not to sell them as advertised.

311. GM has engaged in deceptive trade practices under § 10-1-372(a)(12) by engaging in "other conduct which similarly creates a likelihood of confusion or misunderstanding."

312. Plaintiff relied on GM's deceptive omissions.

313. Plaintiff is likely to be damaged by GM's deceptive trade practices.

314. For example, GM claims that Plaintiff's only recourse is to have its authorized dealers or service centers repair the radiator hose and other components, but the "repaired" hose and seal/O-ring and other components are defective too.

315. Plaintiff will continue to suffer harm.

316. Plaintiff will also suffer future harm because GM's deceptive trade practices will, in effect, leave them saddled with another defective Class Vehicle.

317. That's in part because the resale market for motor vehicles with a known, unresolved Cooling System defect is substantially diminished.

318. Vehicles prone to sudden coolant loss and engine overheating are unsafe and unreliable as transportation.

319. So, Plaintiff's only option is to trade the Class Vehicles with GM. But the only vehicles that GM makes in the same price range are Class Vehicles.

320. Because of GM's deceptive trade practices, Plaintiff is likely stuck with GM's defective products for the foreseeable future.

321. Under § 10-1-373(b)(2), Plaintiff may recover costs and attorney's fees because GM willfully engaged in those trade practices knowing that they are deceptive.

## COUNT 3
## VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
## Ga. Code Ann. § 10-1-390, *et seq.*

322. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

323. Plaintiff makes this claim individually and on behalf of the Georgia Class.

324. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code. Ann. § 10-1-393(a).

325. By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of Ga. Code. Ann. § 10-1-393(a).

326. GM's omissions regarding the Defect, described above, that results coolant to leak from the radiator hose connections early within the warranty period and the Class Vehicles' useful life, are material facts that a reasonable person would

have considered in deciding whether or not to purchase (or to pay the same price for) the vehicle.

327. GM intended for Plaintiff and the other Class Members to rely on GM's omissions of fact regarding the Defect.

328. Plaintiff and the other Class Members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described Defect that results in coolant loss and engine damage within the Class Vehicles, as evidenced by Plaintiff's purchase of his Class Vehicle.

329. Had GM disclosed all material information regarding the Defect to Plaintiff and the other Class Members, then Plaintiff and the other Class Members would not have purchased or leased the vehicle or would have paid less to do so.

330. GM's omissions deceived Plaintiff and the other Class Members.

331. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold to Plaintiff and the other Class Members vehicles with defective Cooling Systems that are essentially unusable for the purposes for which they were sold.

332. The injuries to Plaintiff are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff or to any competition under all of the circumstances.

333. In light of GM's exclusive knowledge of the Defect, the injury is not one that Plaintiff could have reasonably avoided.

334. Further, and to the extent required by law, GM had a duty to disclose the Defect because disclosure of the Defect was necessary to dispel misleading impressions about the Class Vehicles' reliability and durable that were or might have been created by partial representation of the facts.

335. GM promoted, through its advertisements available to all Class members, that the vehicles were reliable and durable.

336. GM disclosed information about the engines and the Cooling Systems equipped therein in window stickers associated with the Class Vehicles, without disclosing that the Class Vehicles contained an inherent defect that would be material to any purchaser or lessee.

337. GM owed Plaintiff and the Class Members a duty to disclose all the material facts concerning the Defect because it possessed exclusive knowledge, it intentionally concealed the defect from Plaintiff and the Class Members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

338. GM's unfair or deceptive acts or practices were likely to, and did, in fact, deceive consumers, including Plaintiff and the other Class Members, about the true reliability, dependability, efficiency, and quality of the Class Vehicles.

339. GM's violations present a continuing risk to Plaintiff and the Class Members, as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

340. Plaintiff and the other Class Members suffered ascertainable loss and actual damages as a direct result of GM's concealment of and failure to disclose material information, namely, the Defect.

341. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed.

342. Plaintiff and the other Class Members also suffered diminished value of their vehicles.

343. Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiff and the Class Members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble damages, and any other just and proper relief available under the Georgia FBPA.

344. On May 21, 2026, Plaintiff Dixon sent a notice letter to GM complying with Ga. Code. Ann. § 10-1-399(b).

345. GM was provided notice of the issues raised in this count and this Complaint by the numerous complaints filed against them and the notice letter sent

by Plaintiff within a reasonable amount of time after the allegations of Class Vehicle defects became public.

346. Because GM failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which Plaintiff and the Class members are entitled.

**COUNT 4**
**Breach of Express Warranty**
**(O.C.G.A. § 11-2-313)**
**(Individually and on behalf of the Georgia Class)**

347. Plaintiff incorporates the allegations from the preceding paragraphs as if fully set forth herein.

348. Plaintiff makes this claim individually and on behalf of the Georgia Class.

349. GM is a "seller" under O.C.G.A. § 11-2-313 with respect to the Class Vehicles. Plaintiff and the Class are "buyers" under those statutes.

350. Plaintiff and the Class have had sufficient direct dealings with GM, its agents, or both to establish privity of contract.

351. GM has a direct relationship with its dealers, and they worked together to promote and sell the Class Vehicles.

352. Privity is not needed here because Plaintiff and the Class are intended third-party beneficiaries of contracts between GM and its dealers.

353. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles.

354. The warranty agreements were, after all, designed for and intended to benefit consumers.

355. Privity is not needed because the Class Vehicles are dangerous instrumentalities.

356. Section 11-2-313 provides that a seller's affirmations of fact or promises about the goods that become part of the basis of the bargain creates express warranties that the goods will conform to the affirmations or promises.

357. Descriptions of goods that become part of the bargain also create express warranties that the goods will conform to those descriptions.

358. Samples or models of goods that become part of the bargain create express warranties that the goods will conform to the samples or models.

359. The warranty that GM provides for Class Vehicles is an express warranty.

360. The warranty guarantees, among other things, that GM will repair "any defect" in the Class Vehicles.

361. GM created and extended the warranty to Plaintiff and the Class in connection with the sale of Class Vehicles.

362. The warranty formed part of the basis of the bargain for GM's sale of Class Vehicles to Plaintiff and the Class.

363. GM described the Class Vehicles as reliable and safe.

364. Those affirmations of fact, promises, and descriptions were part of the basis of the bargain.

365. The Class Vehicles were bought and sold subject to those warranties.

366. Those warranties are not "merely" "affirmation[s] … of the value of the goods" under § 11-2-313(2). Nor are they "merely the seller's opinion or commendation of the goods" under § 11-2-313(2).

367. If a court construes any of the express warranties as limited to vehicle defects related to materials or workmanship, GM breached that express warranty too.

368. GM breached its express warranties by, among other things, selling Plaintiff and the Class Vehicles with defective radiator hose quick-connect sealing components.

369. GM knew the Class Vehicles were defective before it sold them.

370. GM knew that Plaintiff and the Class could not discover the Defect by inspecting the vehicles. GM had a duty to disclose the Defect but failed to do so.

371. The Class Vehicles were defective at the time of sale, contracting, or both. Plaintiff and the Class used the Class Vehicles in a manner consistent with the vehicles' operating instructions.

372. Plaintiff experienced Cooling System problems covered by GM's express warranties within the warranty period and sought repairs at an authorized GM dealership.

373. Many other Class Members similarly experienced the Defect within the warranty period; however, a significant portion of Class Members experienced the Defect after the three-year/36,000-mile bumper-to-bumper warranty expired, while the vehicle was still well within its expected useful life, and were denied warranty coverage on that basis.

374. GM has been unwilling or unable to properly repair the Class Vehicles.

375. Even though GM may have tried to repair some of the Class Vehicles, the repairs failed to fix the Defect.

376. Some consumers sought repairs multiple times during the warranty period and still experienced the Defect.

377. The repairs were ineffective.

378. GM's express warranties do not require that Plaintiff or the Class give it direct written notice of the Defect.

379. Even if the express warranties were to require direct written notice of the Defect, GM has waived that requirement by conduct because it attempted but failed to properly repair the Defect under the warranty.

380. Plaintiff and the Class have given GM written notice of the Defect.

381. Plaintiff and the Class notified GM of the Defect within a reasonable time after they discovered it.

382. GM had actual notice of the Defect in the Class Vehicles before sale and received timely notice of the breaches experienced by Plaintiff and the Class Members.

383. GM breached its express warranties because the Class Vehicles are neither safe nor reliable: they are prone to premature degradation and failure of the quick-connect hoses connected to the radiator, and for that reason they are unsafe and unreliable.

384. GM's failure to provide Plaintiff and Class Members with a non-defective replacement vehicle or a refund of the purchase price departs from commercially reasonable behavior and violates Plaintiff and the Class Members' objectively reasonable expectations arising from the express warranties.

385. The express warranties fail in their essential purpose. The contractual remedy is insufficient to make Plaintiff and the Class whole because GM failed or refused to adequately provide the promised remedies in a reasonable time.

386. Plaintiff and the Class Members' recovery is not limited to the express warranty of repair for defective materials and workmanship. Plaintiff and the Class seek all the relief that law allows.

387. Repairs and replacement hoses and/or seals cannot cure the damage that the Class Vehicles have caused.

388. Plaintiff and the Class have already suffered significant incidental and consequential damages, including diminution in value and loss of use, because of GM's breaches of its express warranties and because of its failure to properly remedy the problem in a reasonable time.

389. Limiting Plaintiff and the Class Members' remedies to repair, replacement, or both would only guarantee that they would never be made whole.

390. Any attempt by GM to disclaim or limit its express warranties by way of consumers would be inappropriate under the circumstances.

391. Any asserted limitation is procedurally and substantively unconscionable and thus unenforceable because GM knowingly sold a defective product without informing consumers and failed to honor its express warranties.

392. As a direct and proximate result of GM's breach of express warranties, Plaintiff and the Class sustained damages.

**<u>COUNT 5</u>**
**Breach of Implied Warranty of Merchantability**
**(O.C.G.A. § 11-2-314)**
**(Individually and on behalf of the Georgia Class)**

393. Plaintiff incorporates the allegations from the preceding paragraphs as if fully set forth herein.

394. Plaintiff makes this claim individually and on behalf of the Georgia Class.

395. GM is a “seller” and “merchant” under O.C.G.A. § 11-2-314 with respect to the Class Vehicles.

396. Section 11-2-314 creates a warranty of merchantability implicit in the contracts for the sales of Class Vehicles.

397. The Class Vehicles were bought and sold subject to that warranty.

398. GM breached its implied warranty of merchantability.

399. At the time of sale and all relevant times, the Class Vehicles could not pass without objection in the trade under the contract description, are not fit for their ordinary purpose, and do not conform to the promises or affirmations of fact made in marketing materials.

400. Automobiles’ ordinary purpose is providing safe, reliable transportation.

401. The Defect in the Class Vehicles makes them unsafe and unreliable as means of transportation.

402. The Defect affects the Class Vehicles’ drivability and usefulness.

403. Plaintiff and the Class Members' vehicles are or were not drivable because of the Defect.

404. Automobiles prone to sudden and catastrophic Cooling System failure are not merchantable.

405. Based upon the Defect, GM has failed to meet the expectations of a reasonable consumer.

406. GM breached the implied warranty of merchantability in connection with its sale and distribution of the Class Vehicles.

407. The Defect existed when the Class Vehicles left GM's possession and is substantially certain to manifest.

408. GM has waived any implied warranty notice requirement by conduct because it attempted but failed to properly repair the Defect under the warranty.

409. GM had actual notice of the Defect in the Class Vehicles before sale and received reasonable notice of the breaches experienced by Plaintiff and the Class Members.

410. Plaintiff and the Class have had sufficient direct dealings with GM, its agents, or both to establish privity of contract.

411. GM has a direct relationship with its dealers, and they worked together to promote and sell the Class Vehicles.

412. Privity is not needed here because Plaintiff and the Class are intended third-party beneficiaries of contracts between GM and its dealers.

413. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles.

414. The warranty agreements were, after all, designed for and intended to benefit consumers.

415. Privity is not needed because the Class Vehicles are dangerous instrumentalities.

416. If Plaintiff and the Class Members had known about the Defect in the Class Vehicles, they would not have bought them or would have paid significantly less for them.

417. Plaintiff and the Class Members gave GM a chance to cure its breach of warranty and otherwise complied with any obligations under the implied warranty of merchantability.

418. That said, and despite knowing of the Defect before or concurrently with the release of the Class Vehicles, GM has refused to provide Plaintiff and the Class with appropriate warranty relief, leaving them without the functional product they thought they were buying.

419. Providing additional notice to GM now is futile because GM has continually failed to provide adequate remedies to Plaintiff and Class Members.

420. If GM attempted to exclude or modify the implied warranty of merchantability in writing, the attempted exclusion or modification is ineffective because it is inconspicuous.

421. What's more, the circumstances cause any exclusion or limitation of remedies to fail their essential purpose.

422. Any limitation or exclusion of consequential damages is substantively and procedurally unconscionable.

423. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the Class sustained damages.

**COUNT 6**
**Fraudulent Concealment**
**(Individually and on behalf of the Georgia Class)**

424. Plaintiff incorporates the allegations from the preceding paragraphs as if fully set forth herein.

425. Plaintiff makes this claim individually and on behalf of the Georgia Class.

426. GM was aware of the Defect when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

427. Having been aware of the Defect and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Defect, GM had a duty to disclose the Defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

428. GM did not disclose the Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

429. For the reasons set forth above, the Defect comprises material information with respect to the sale or lease of the Class Vehicles.

430. In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

431. Had Plaintiff and the other members of the Class known of the Defect, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

432. Through its omissions regarding the Defect, GM intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

433. As a direct and proximate result of GM's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have

purchased the Class Vehicles at all if the Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

434. WHEREFORE, Plaintiff, individually and on behalf of the other Class Members, respectfully requests that the Court enter judgment in his favor and against Defendant General Motors LLC as follows:

A. An order certifying the proposed Class and designating the named Plaintiff as the named representative of the Class and designating the undersigned as Class Counsel for the Class;

B. A declaration that the Cooling System and/or related components in Class Vehicles are defective;

C. A declaration that GM is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D. An order enjoining GM to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and directing GM to permanently, expeditiously, and completely repair the Class Vehicles;

E. An award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, including overpayment and diminution in value damages, and punitive damages, in an amount to be proven at trial, as well as other damages available at law;

F. An award to Plaintiff and Class Members for the return of the purchase or lease price of the Class Vehicles, with interest from the time it was paid, the reimbursement of the reasonable expenses occasioned by the sale or lease, and damages;

G. A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defect in Plaintiff's and Class Members' Class Vehicles, can be made and paid, such that GM, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect;

H. A declaration that GM must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

I. An award of attorneys' fees and costs, as allowed by law;

J. An award of pre-judgment and post-judgment interest, as provided by law;

K. Leave to amend this Complaint to conform to the evidence produced at trial; and

L. Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: June 26, 2026

*/s/ H. Clay Barnett, III*
H. Clay Barnett, III (GA Bar No. 174058)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Overlook II
2839 Paces Ferry Road, Suite 400
Atlanta, GA 30339
T: (334) 269-2343 / F: (334) 954-7555
Email: Clay.Barnett@BeasleyAllen.com

W. Daniel "Dee" Miles, III*
James Mitchell "Mitch" Williams*
Dylan T. Martin*
Trenton H. Mann*
**BEASLEY, ALLEN, CROW, METHVIN,**
**PORTIS & MILES, P.C**.
272 Commerce Street
Montgomery, Alabama 36103-4160
T: (334) 269-2343 / F: (334) 954-7555
dee.miles@beasleyallen.com
mitch.williams@beasleyallen.com
dylan.martin@beasleyallen.com
trent.mann@beasleyallen.com